JAMES H. HOLL, III (CA Bar No. 177885)
Email:  jholl@cftc.gov
KAREN KENMOTSU (*Pro Hac Vice* Pending)
Email:  kkenmotsu@cftc.gov
TRACI RODRIGUEZ (*Pro Hac Vice* Pending)
Email:  trodriguez@cftc.gov
PAUL G.  HAYECK (*Pro Hac Vice* Pending)
Email:  phayeck@cftc.gov

Attorneys for Plaintiff
COMMODITY FUTURES
TRADING COMMISSION
1155 21st Street, N.W.
Washington, D.C. 20581
Telephone: (202) 418-5120
Facsimile:  (202) 418-5531

## THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISION,<br><br>Plaintiff,<br><br>v.<br><br>CUNWEN ZHU and JUSTBY INTERNATIONAL AUCTIONS,<br><br>Defendants. | Civil Action No. 2:23-cv-4937<br><br>**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS** |

Plaintiff, Commodity Futures Trading Commission ("Commission" or "CFTC"), by and through its undersigned attorneys, hereby alleges as follows:

## I.      SUMMARY

1.      From approximately April 2021 through March 2022 (the "Relevant Period"), Cunwen Zhu ("Zhu") and his company, Justby International Auctions ("Justby") (Zhu and Justby together, "Defendants"), while acting as a common enterprise with other known and unknown entities (the "Scheme Entities"), engaged in a scheme to defraud at least twenty-nine (29) U.S. customers ("Scheme Customers") by misappropriating more than $1,340,000 in connection with the sale of leveraged, margined, or financed agreements, contracts or transactions in off-exchange retail foreign currency ("forex") contracts and/or digital asset commodities, such as Bitcoin, to U.S. customers who were not eligible contract participants.

2.      Defendant Zhu, individually, and as the controlling person of Justby, accepted Scheme Customers' funds into Justby's bank accounts knowing, or recklessly disregarding, that these funds were intended to be used to engage in forex and/or digital asset commodity transactions on behalf of the Scheme Customers. Defendants misappropriated all of the $1,340,000 they received from Scheme Customers by transferring the funds from Justby's bank accounts to Zhu's personal bank accounts.  Once in his bank account, some of the funds were misappropriated by Zhu to pay for his personal expenses while the majority of the funds were further

transferred to other bank accounts, digital asset commodity trading accounts and digital wallet addresses controlled by the Defendants and the Scheme Entities.

3. Throughout the Relevant Period, the Defendants and the Scheme Entities acted as a single, integrated common enterprise in order to carry out their fraudulent scheme. The fraudulent scheme followed a similar pattern. Individuals acting on behalf of the Scheme Entities contacted the Scheme Customers via social media (hereinafter, "Solicitors"). The Solicitors claimed to have knowledge or inside information that allowed them to earn huge profits trading in forex and/or digital asset commodities such as Bitcoin or Ether. The Solicitors offered to share their knowledge or inside information with Scheme Customers and to help them trade by providing particularized trading advice.

4. Most of the Scheme Customers were not eligible contract participants ("ECPs") pursuant to Section 1a(18)(A)(xi) of the Commodity Exchange Act ("Act or "CEA"), 7 U.S.C. §1a(18)(A)(xi).

5. Once Scheme Customers decided to participate, the Solicitors introduced them to a trading firm ("Trading Firm") where Scheme Customers set up their "trading accounts." The Trading Firm customer service representatives ("TF Customer Service") provided Scheme Customers with wire transfer instructions regarding the bank accounts to which they should wire their funds, such as Justby's bank accounts; or, digital wallet addresses if the Scheme Customers were transferring digital asset commodities. Once received, customer funds were misappropriated by

the Defendants and Scheme Entities.  Unbeknownst to the Scheme Customers, the "trading accounts" were a complete ruse and no actual trading took place on behalf of the Scheme Customers.

6.    As part of the fraudulent scheme, TF Customer Service "assisted" Scheme Customers in setting up their trading accounts by instructing them to download a third-party software application ("application") onto their cellular telephone or mobile device.  These applications would allegedly allow Scheme Customers to trade forex and digital asset commodities on legitimate, well-known trading platforms.

7.    In fact, the applications did not interface with a legitimate trading platform and the Scheme Customers were actually interfacing with individuals who were also part of the fraudulent scheme.  The applications only mimicked the features of a live trading platform by, among other things, allowing Scheme Customers to enter and track their trades, interface with customer service representatives, and check their account balances.  The information contained in the applications, such as trade data and account history, was controlled by the Scheme Entities.

8.    Typically, Scheme Customers' trading accounts showed that their trading was highly successful and earning excellent profits.  These representations were fictional.  Scheme Customers' funds were not used to trade and consequently, there were no profits.  The Solicitors used these false profits to encourage customers

to transfer additional funds for trading.  Many customers transferred additional sums with the Trading Firms based on these fictitious profits.

9.      Initially, Scheme Customers were able to withdraw small amounts of their funds.  In fact, some Solicitors encouraged Scheme Customers to withdraw some of their funds as proof that the Trading Firm was legitimate.

10.      However, if Scheme Customers attempted to close their account or withdraw large amounts from their trading accounts, they were met with great resistance.  For example, TF Customer Service would inform the customer that they could not withdraw funds from their trading account until the customer sent in additional funds to cover taxes on their profits, which generally amounted to 25%-30% of the value of the account.  The Solicitor sometimes recommended a trade which would conveniently result in the Scheme Customer's account having  a negative balance.  Alternatively, a trade would suddenly appear in the customer account which caused a negative balance in the account.  Some Scheme Customers were further defrauded because they sent in additional funds to pay for their "taxes" or to cover their "negative balance."

11.      In the end, Scheme Customers lost nearly all of their trading funds.  Other than the small withdrawals they may have made initially, Scheme Customers were unable to withdraw their funds or purported profits from their fictitious trading accounts.

12.     The Defendants misappropriated all of the $1,340,000 sent to Justby by the Scheme Customers.  Zhu misappropriated some of the funds for his personal use. However, the majority of the Scheme Customer funds were transferred to offshore digital asset wallets, digital asset trading accounts, and bank accounts controlled by the Scheme Entities.

13.     In this manner, during the Relevant Period, the Defendants and the Scheme Entities operated an elaborate and well-coordinated scheme to fraudulently solicit, misappropriate, and funnel funds from U.S. customers to locations within and outside of the U.S. for the purpose of enriching themselves to the detriment of U.S. digital asset commodity and/or forex customers.

14.     Zhu individually, and as a controlling person of Justby, knew or recklessly disregarded, that the misappropriated funds were Scheme Customer funds intended to be used for the purpose of trading forex and/or digital asset commodities.

15.     By this conduct, and the conduct further described herein, Defendants have engaged, are engaging, and/or are about to engage in acts and practices in violation of Sections 4b(a)(2)(A)-(C) and 6(c)(1) of the Act, 7 U.S.C. §§ 6b(a)(2)(A)-(C), 9(1), and Commission Regulations ("Regulations") 5.2(b)(1)-(3) and 180.1(a)(1)-(3), 17 C.F.R. §§ 5.2(b)(1)-(3), 180.1(a)(1)-(3) (2022).

16.     Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint, and similar acts and practices, as more fully described below.

17.     Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, and Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C), the Commission brings this action to permanently enjoin Defendants' unlawful acts and practices, to compel their compliance with the Act and the Regulations, and to further enjoin them from engaging in any commodity-interest related activity, as set forth below.  In addition, the Commission seeks civil monetary penalties for each violation of the Act and Regulations, and remedial ancillary relief, including, but not limited to, trading bans, restitution, disgorgement, an accounting, pre- and post-judgment interest, and such other relief as the Court deems necessary and appropriate.

## II.     JURISDICTION AND VENUE

18.     This Court possesses jurisdiction over this action pursuant to 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  In addition, Section 6c of the Act, 7 U.S.C. § 13a-1(a), authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder, and Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C), provides the Commission with jurisdiction over the forex solicitations and transactions at issue in this action.

19.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), and 28 U.S.C. § 1391(b) because Zhu resides in this District, Defendants transact or transacted business in this District, and certain of the transactions, acts, practices, and courses of business alleged in this Complaint occurred, are occurring, or are about to occur within this District.

### III.     THE PARTIES

### A.     PLAINTIFF

20.     Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and Regulations.  The Commission maintains its principal office at Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581.

### B.     DEFENDANTS

21.     Defendant **Cunwen Zhu** is resides in Walnut, California.  Zhu is the chief executive officer and registered agent of Justby.  Zhu has never been registered with the Commission in any capacity.

22.     Defendant **Justby International Auctions** is a stock corporation established by Zhu in April 2021 in the state of California with the address of 8926 E. Valley Boulevard, Rosemead, CA, 91770.  Justby was allegedly engaged in the business of purchasing and selling Asian art, antiques and collectibles.  Justby's registration was terminated on February 6, 2023.  Defendant Zhu acted as the chief

executive officer and registered agent of Justby.  Justby has never been registered with the Commission in any capacity.

23.     During the Relevant Period, Zhu and Justby, together with other entities under the control of known and unknown individuals, operated as a single, integrated common enterprise identified herein as the Scheme Enterprise.  The Defendants and the Scheme Enterprise shared common customers, assets, solicitations, and were controlled by the same individuals.

## IV.    STATUTORY BACKGROUND AND LEGAL FRAMEWORK

24.     The purpose of the CEA or Act is to "serve the public interests . . . through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission," as well as "to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to [the] Act and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants."  Section 3 of the Act, 7 U.S.C. § 5.

25.     A digital asset is anything that can be stored and transmitted electronically and has associated ownership or use rights.  Digital asset commodities include virtual currencies, such as Bitcoin (BTC), Ether (ETH) and stablecoins such as Tether (USDT), which are digital representations of value that function as

mediums of exchange, units of account and/or stores of value.  Additionally, digital asset commodities such as Bitcoin (BTC), Ether (ETH), stablecoins such as Tether (USDT) and others are "commodities" as defined under Section 1a(9) of the Act, 7 U.S.C. § 1a(9).

26.     In recent years, as digital asset markets have evolved, the CFTC has approved the offer of futures contracts on digital asset commodities, including Bitcoin and Ether futures and options, by boards of trade designated as contract markets by the Commission, including the Chicago Mercantile Exchange and Cboe Digital Exchange.

27.     Section 2(c)(2)(C)(i)(I) of the Act, 7 U.S.C. § 2(c)(2)(C)(i)(I), in relevant part, applies to any agreement, contract, or transaction in, or in connection with, forex that is offered to, or entered into with, a person that is not an ECP "on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis," subject to certain exceptions not applicable here.

28.     Section 1a(18)(A)(xi) of the Act, 7 U.S.C. § 1a(18)(A)(xi), defines an ECP, in relevant part, as an individual:  (a) who has amounts invested on a discretionary basis, the aggregate of which exceeds $10 million, or (b) $5 million if the individual enters into the transaction to "manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual."  Individuals who do not meet these criteria are non-ECPs.

## V.    FACTS

### A.    Defendant Zhu Operated Justby as a Shell Company

29.    Defendant Zhu registered Justby International Auctions with the State of California as a stock corporation in April 2021.

30.    Justby's registered address was located in Rosemead, California.  Justby claimed to be engaged in the business of purchasing and selling Asian art, antiques and collectibles.

31.    Zhu is the CEO, sole owner, and registered agent for Justby.

32.    In sworn testimony before staff of the Commission, Zhu stated that he exercised sole control over all of Justby's operations, including Justby's bank accounts and employees.

33.    Zhu further claimed that Justby's estimated expenditures were $200,000 in 2021 and $80,000-$100,000 in 2022.  He also represented that Justby's revenues were approximately the same, with a maximum sale of around $10,000.

34.    During the Relevant Period, Zhu opened and controlled bank accounts in the name of Justby at multiple banks ("Justby's bank accounts").

35.    Despite Zhu's claim that Justby only made sales of a few hundred thousand dollars per year, the aggregated total amount received into Justby's bank accounts during the Relevant Period was in excess of $7,500,000 with approximately $1,340,000 coming from the Scheme Customers for purposes of entering into forex and/or digital asset commodity transactions.

36.     Despite Zhu's claim that Justby's largest sale was for approximately $10,000, Justby's bank accounts routinely received numerous cash deposits, checks and wire transfers in excess of $200,000.

37.     Justby lacks the indicia of a legitimate business.  Specifically, Justby does not maintain books and records normally associated with an auction-type business such as a ledger of purchases and sales.

38.     Justby's bank records do not reflect payments of the type commonly associated with a business such as a regular payroll, rent, insurance and utilities.

39.     Justby's claimed sales and expenditures do not align with its aggregated bank deposits of over $7,500,000.

**B.     The Fraudulent Scheme**

40.     Throughout the Relevant Period, the Defendants and the Scheme Entities acted as a single, integrated common enterprise in order to carry out their fraudulent scheme.  The scheme involved the coordinated efforts of three groups: (1) "Solicitors" who contacted Scheme Customers via social media and pretended to befriend or romance the customers in order to solicit them to open and fund trading accounts; (2) "Trading Firms" which purported to set up trading accounts on behalf of Scheme Customers; and (3) "Shell Companies" such as Defendant Justby, whose bank accounts were used by the Defendants and Scheme Entities to accept and misappropriate Scheme Customer funds.

41.     This type of fraudulent scheme is commonly referred to as a "Sha Zhu Pan" or "Pig Butchering" scheme by its operators because it involves cultivating a friendly or romantic relationship with a potential investor and "fattening" them up with falsehoods in order to gain the potential customer's trust and eventually solicit them to invest in a fraudulent financial opportunity.

42.     Throughout the Relevant Period, the Solicitors spent time cultivating a friendly or romantic relationship with the Scheme Customers, most of whom were non-ECPs.  At least one Scheme Customer, Customer A was in contact with their Solicitor for over a year before they were convinced by their Solicitor to open and fund a forex trading account.

43.     Solicitors established a rapport with the Scheme Customers by messaging them frequently, sharing purported pictures of themselves in expensive locales or with expensive items such as luxury cars. The Solicitor always claimed to be a highly successful trader and usually attributed their success to an "uncle" or an "insider" who provided them with inside knowledge.

44.     In order to demonstrate their trading success, the Solicitor typically provided screen shots of their purported trading accounts which always showed incredible trading results.

45.     For example, around September 2021, Customer A was sent screen shots of their Solicitor's purported forex trading results, which amounted to millions of dollars in profit in one day of trading.

46.     Once the Solicitor gained the Scheme Customer's trust, they encouraged the customer to open a forex and/or digital asset commodity trading account and offered to share their inside knowledge with the Scheme Customer so that they too might earn extraordinary returns.

47.     Once a customer decided to participate, the Solicitor introduced the Scheme Customer to a Trading Firm.

48.     The Trading Firms instructed the Scheme Customers to download an application on their mobile phone or device in order to gain access to a forex and/or digital asset commodity trading platform.  Although the trading platforms recommended to customers were legitimate, the application did not actually provide Scheme Customers with access to a legitimate trading platform.

### i.     False Trade Records Provided to Scheme Customers

49.     In fact, the application only allowed Scheme Customers to interface with individuals who were also part of the fraudulent scheme.  The application merely mimicked the features of trading forex and/or digital asset commodities on a live trading platform.

50.     The Scheme Entities controlled the information provided to the Scheme Customers via the application.  The application provided the Scheme Customers with fictitious information concerning, among other things:  profits and losses, account balances, forex and/or digital asset commodity trading transactions, and deposits and withdrawals of funds into and out of their trading accounts.  All of this information

was false since no actual forex and/or digital asset commodity trading took place on behalf of the Scheme Customers.

### ii.    Scheme Customers Sent Funds to Justby's Bank Accounts

51.    In order to fund their purported trading accounts, TF Customer service provided Scheme Customers with Justby's bank account details as well as the bank account details and digital wallet addresses for other entities who were part of the scheme.  Customers often sent their wire transfers and digital asset commodity transfers to multiple entities related to the Scheme Entities.

52.    For example, between May 5, 2021 through June 23, 2021, Customer B, who was not an ECP, transferred approximately $198,282 in both fiat currency, specifically the US Dollar, and digital asset commodities to bank accounts and digital wallets provided to Customer B by TF Customer Service for the purpose of funding a digital asset commodity trading account.  On or about May 25, 2021, Customer B sent $58,500 via wire transfer to a Justby bank account and the rest of Customer B's investment funds were sent to other digital wallet addresses and/or bank accounts related to the Scheme Entities.

53.    Scheme Customers' purported trading account balances reflected the receipt of their wire transfers soon after the wire transfers were sent to Justby.  In total, Justby received over $1,340,000 in wire transfers from Scheme Customers.

### iii.   Defendants and the Scheme Entities Used Forged Justby Bank Account Records to Defraud a Scheme Customer

54.     TF Customer Service issued falsified bank records regarding one of Justby's bank accounts to at least one Scheme Customer.

55.     Specifically, on or about July 8, 2021 TF Customer Service falsely represented to Customer B that their wire transfer of $58,500 never posted to a Justby bank account and demanded that Customer B send in the "missing" funds.  TF Customer Service sent Customer B falsified bank records which falsely showed that Justby never received Customer B's wire transfer of $58,000 on May 25, 2021, when in fact, the funds were received on that day.

### iv.   The Scheme Entities Used False Trading Successes to Solicit Additional Funds from Scheme Customers

56.     Once their accounts were funded, the Solicitors provided Scheme Customers with specific trading advice.  The Solicitors instructed the Scheme Customers regarding exactly which product the Scheme Customers should trade and when they should enter and exit each trade.

57.     Overall, the Scheme Customers were led to believe that they were earning incredible returns from their trading.  Their Trading Firm accounts generally showed consistent wins with very few, if any, losses.

58.     For example, Customer A opened a forex trading account on or about October 2021.  Between October 2021 and February 2022, this account purportedly accrued profits in excess of $2,000,000.

59.     In addition, between May 2021 to June 2021, Customer B's digital asset commodity trading account purportedly accrued profits in excess of $500,000.

60.     The Solicitors used these purported successes to encourage customers to deposit additional funds with the Trading Firms.  Many Scheme Customers did this multiple times, including Customers A and B.

61.     Initially, Scheme Customers were encouraged by their Solicitors to withdraw small sums from their purported trading accounts in order to prove the legitimacy of their Trading Firm.

62.     For example, around May 2021, Customer B withdrew $818 from Customer B's trading account upon the advice and encouragement of Customer B's Solicitor.

63.     However, when Scheme Customers attempted to withdraw large sums from their purported trading accounts or to close their accounts, they were unable to do so.

64.     For example, on or about May 28, 2021, Customer C sent a wire transfer in the amount of $500,000 from their bank account to one of Justby's bank accounts in order to fund a forex trading account.  Customer C also sent additional wire transfers to other bank accounts under the control of other Scheme Entities.  However, one of Customer C's wire transfer attempts was stopped by their bank due to suspicion of fraud.  At this point, Customer C became skeptical of their transactions and their interactions with their Solicitor.  When Customer C attempted

to withdraw $1,000,000 from their trading account, TF Customer Service informed Customer C that it would take up to ten (10) business days to receive the transfer. Customer C decided to conduct one last trade in their trading account following their Solicitor's specific trading instructions and this trade resulted in losses which left Customer C's account with a negative balance.  Customer C analyzed their last trade with existing market data and discovered an inconsistency in the market value between their last trade and the existing market data.

65.     The Trading Firms employed tactics to further defraud the Scheme Customers, such as telling Scheme Customers that they would need to pay taxes before their funds could be withdrawn.  As a result, some of the Scheme Customers transferred additional funds to their trading accounts to cover these "taxes."  The tax payments were just a ruse and Scheme Customers were unable to withdraw their funds even after submitting the tax payments.

66.     Apart from small withdrawals, none of the Scheme Customers were able to withdraw their funds from their Trading Accounts.  Eventually, TF Customer Service stopped communicating with Scheme Customers and the applications ceased functioning.

### C.     Defendants and the Scheme Entities Operated as a Common Enterprise

67.     Together with the other Scheme Entities, Defendants Justby and Zhu operated as a common enterprise with a shared purpose of defrauding Scheme

Customers.  Defendant Justby was a shell company which served no legitimate business purpose other than to accept and funnel funds to the Scheme Entities.

68.     Defendants and the Scheme Entities operated as an integrated whole in that they shared common control, assets, customers, fraudulent solicitations, and funneled customer funds to common entities, generally located offshore.

69.     The coordinated manner in which Justby interacted with the Scheme Entities indicates there was a common control being exercised.  For example, Scheme Customer funds deposited into Justby's bank accounts were reflected very quickly in the Scheme Customers' purported trading account balances.

70.     When Scheme Customers received a withdrawal from their purported trading accounts, the funds did not come from Justby's bank accounts or digital asset commodity accounts.  Instead, Scheme Customers received funds from other bank or digital asset commodity accounts under the control of the Scheme Enterprise.

**D.    Defendant Zhu Knew or Recklessly Disregarded that Scheme Customer Funds were Sent to Justby for Trading**

71.     As the sole signatory on the Justby bank accounts, Defendant Zhu had personal knowledge of the origin of funds being accepted into Justby's bank accounts and was responsible for the disposition of those funds.

72.     Wire transfers from Scheme Customers contained notations indicating they were sent for purposes of trading and not for other services or goods, such as antiques.

73.  For example, on or about May 25, 2021, one of Justby's bank accounts received a wire transfer from Customer D in the amount of $10,000 with the notation "Investment."

74.  On or about March 17, 2022, Customer E sent a wire transfer to one of Justby's bank accounts in the amount of $5,480 with the notation "Commodities."

75.  On or about March 9, 2022 Customer F sent a wire transfer to one of Justby's bank accounts in the amount of $10,000 with the notation "Attn:  Manager (name of trading firm) Account."

76.  Defendants also received funds from other scheme entities, which were unrelated to Justby's purported "antiques" business.  For example, on or about August 17, 2021, one of Justby's bank accounts received a wire transfer in the amount of $160,000 from one of the Scheme Entities with a notation of "Investment Funds."

**E.  Defendants Misappropriated Customer Funds for their Own Benefit and for the Benefit of the Scheme Entities**

77.  Defendants accepted the deposit of $1,340,000 from at least twenty- nine (29) Scheme Customers into bank accounts in the name of Justby and controlled by Zhu.  Defendants and the Scheme Entities did not use the funds to enter into any forex agreements, contracts, or transactions on behalf of Scheme Customers.  Moreover, Defendants and the Scheme Entities did not use the funds to enter into any digital asset commodity transactions on behalf of customers.

78.     Instead, the Defendants misappropriated all of the Scheme Customer funds.  Zhu misappropriated some of the funds for his personal use.  The Defendants, however, used the vast majority of the customer funds to purchase digital asset commodities, such as less-traceable stablecoins like USDC (digital dollar), and then transferred those digital asset commodities to digital wallets and digital asset commodity trading platforms controlled by the Scheme Entities.  In addition, Defendants also sent wire transfers to bank accounts controlled by the Scheme Entities.  The Scheme Entities' digital wallets, digital asset commodity trading platforms and bank accounts were generally located offshore.

79.     Defendants never returned any funds to any Scheme Customer. Therefore, Scheme Customers lost more than $1,340,000 as a result of the Defendants' fraudulent scheme.

## VI.   VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT I
**(Defendants Zhu and Justby)**
**FRAUD IN CONNECTION WITH FOREX**
**Violations of Section 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C), and Regulation 5.2(b)(1)-(3), 17 C.F.R. § 5.2(b)(1)-(3) (2022)**

80.     The allegations in paragraphs 1-79 are re-alleged and incorporated herein by reference.

81.     Section 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C), makes it unlawful:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

[F]or any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, [ . . . ] that is made, or to be made, for or on behalf of, or with, any other person other than on or subject to the rules of a designated contract market—(A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report of statement . . . [or] (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person.

82.    Pursuant to Section 2(c)(2)(C)(iv) of the Act, 7 U.S.C. § 2(c)(2)(C)(iv), Section 4b of the Act, 7 U.S.C. § 6b, applies to the forex transactions, agreements, or contracts described in Section 2(c)(2)(C)(i) of the Act, 7 U.S.C. §2(c)(2)(C)(i), "as if" they were contracts of sale of a commodity for future delivery.  Further, Section 2(c)(2)(C)(ii)(I) of the Act, 7 U.S.C. § 2(c)(2)(C)(ii)(I), also makes those forex agreements, contracts, or transactions "subject to" Section 4b, 7 U.S.C. § 6b.  Finally, Section 2(c)(2)(C)(vii) of the Act, 7 U.S.C. § 2(c)(2)(C)(vii), makes clear the CFTC

has jurisdiction over an account that is offered for the purpose of trading forex described in Section 2(c)(2)(C)(i) of the Act, 7 U.S.C. §2(c)(2)(C)(i).

83.     Regulation 5.2(b)(1)-(3), 17 C.F.R. § 5.2(b)(1)-(3), makes it unlawful for any person, by use of the mails or by any instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction:  (1) to cheat or defraud or attempt to cheat or defraud any person; (2) willfully to make or cause to be made to any person any false report or statement or cause to be entered for any person any false record; or (3) willfully to deceive or attempt to deceive any person by any means whatsoever.

84.     During the Relevant Period, Defendants Zhu and Justby, acting as a common enterprise with the Scheme Entities, violated Section 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C), and Regulation 5.2(b)(1)-(3), 17 C.F.R. § 5.2(b)(1)-(3), by willfully deceiving or attempting to deceive other persons in, or in connection with, the offering of leveraged, margined or financed off-exchange retail forex transactions with non-ECPs, by among other things:  (i) misappropriating Scheme Customer funds; (ii) sending, or causing false trading records to be sent to Scheme Customers; and (iii) sending or causing false bank records to be sent to a Scheme Customer.

85.     Further, Defendants Zhu and Justby, acting as a common enterprise with the Scheme Entities, violated Section 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(2)(A), (C), and Regulation 5.2(b)(1) and (3), 17 C.F.R. § 5.2(b)(1), (3), by

knowingly and/or recklessly failing to disclose material facts to Scheme Customers, including by failing to disclose that:  (i) their funds would not be used for trading; (ii) their funds would be misappropriated; and (iii) the applications used by the Trading Firms were completely fraudulent, no trading occurred and the posted returns were fake, all in violation of Section 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(2)(A), (C), and Regulation 5.2(b)(1) and (3), 17 C.F.R. § 5.2(b)(1), (3).

86.     The Defendants' omissions were material because they deprived the Scheme Customers of valuable information that the customers would have considered when deciding to commit their funds.

87.     Defendants engaged in the acts and practices described above using instrumentalities of interstate commerce, including but not limited to: interstate wires for transfer of funds, email, websites, and other electronic communication devices.

88.     Defendants engaged in the acts and practices described above willfully, intentionally, or recklessly.

89.     Specifically, Zhu, acting both individually and as agent and officer of Justby, engaged in the acts and practices described above knowingly, willfully, or with reckless disregard for the truth.  Zhu was an active participant in the fraudulent scheme.  Zhu established his shell corporation Justby; opened bank accounts in the name of Justby; misappropriated customer funds; used some of the misappropriated funds to purchase less traceable digital asset commodities (stablecoins) and then diverted the digital asset commodities and other funds to digital wallet addresses and

bank accounts which were controlled and operated by the Scheme Enterprise.  In addition, Zhu or someone acting in concert with him, issued false bank records to at least one Scheme Customer for the purpose of soliciting the customer to transfer more funds to Justby.

90.     Zhu controlled Justby directly or indirectly, and did not act in good faith and knowingly induced, directly or indirectly, Justby to commit the acts and/or omissions alleged herein.  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Zhu is liable for Justby's violations of Section 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C), and Regulation 5.2(b)(1)-(3), 17 C.F.R. § 5.2(b)(1)-(3).

91.     Zhu acted within the course and scope of his employment, agency, or office with Justby.  Pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2022), Justby is liable as the principal for Zhu's violations of Section 4b(a)(2)(A)-(C), 7 U.S.C. § 6b(a)(2)(A)-(C), and Regulation 5.2(b)(1)-(3), 17 C.F.R. § 5.2(b)(1)-(3).

92.     Each act of misappropriation, providing false trading and bank records to Scheme Customers, and failing to disclose material information to Scheme Customers, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C), and Regulation 5.2(b)(1)-(3), 17 C.F.R. § 5.2(b)(1)-(3).

## COUNT II
**(Defendants Zhu and Justby)**
**FRAUD BY DECEPTIVE DEVICE OR CONTRIVANCE**
**Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation**
**180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2022)**

93.     The allegations in paragraphs 1-79 are re-alleged and incorporated herein by reference.

94.     Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), makes it "unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate . . . ."

95.     Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3), makes it "unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

1)     use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

2)     make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a

material fact necessary in order to make the

statements made not untrue or misleading; [or]

3)   engage, or attempt to engage, in any act, practice, or

course of business, which operates or would operate

as a fraud or deceit upon any person . . . ."

96.   Digital asset commodities such as Bitcoin and Ether are encompassed in the definition of a "commodity" under Section 1a(9) of the Act, 7 U.S.C. § 1a(9), and contracts for their sale are subject to the prohibitions of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3).

97.   Section 2(c)(2)(C)(ii)(I) of the Act, 7 U.S.C. § 2(c)(2)(C)(ii)(I), makes forex agreements, contracts, or transactions described in Section 2(c)(2)(C)(i) of the Act, 7 U.S.C. §2(c)(2)(C)(i), "subject to" Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a), 17 C.F.R. § 180.1(a).  Further, Section 2(c)(2)(C)(vii) of the Act, 7 U.S.C. § 2(c)(2)(C)(vii), makes clear the CFTC has jurisdiction over an account that is offered for the purpose of trading forex described in Section 2(c)(2)(C)(i) of the Act, 7 U.S.C. §2(c)(2)(C)(i).

98.   During the Relevant Period, Defendants Zhu and Justby, acting as a common enterprise with the Scheme Entities, violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3), by, among other things, in connection with contracts of sale of commodities in interstate commerce and forex:  (1) using or employing, or attempting to use or employ, a

manipulative or deceptive device or contrivance, scheme or artifice to defraud; (2) making omissions of material fact to Scheme Customers; and (3) engaging, or attempting to engage in any act, practice or course of business which operates as a fraud or deceit.  Defendants Zhu and Justby did so by:  (i) misappropriating customer funds; (ii) sending or causing to be to be sent, false trading records to Scheme Customers; and (iii) sending or causing to be sent, false bank records to at least one Scheme Customer for the purpose of soliciting funds from the customer.

99.    Further, Defendants Zhu and Justby, acting as a common enterprise with the Scheme Entities, violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3), by, among other things, knowingly and/or recklessly failing to disclose material facts to Scheme Customers, including by failing to disclose that:  (i) their funds would not be used for trading; (ii) their funds would be misappropriated; and (iii) the applications used by the Trading Firms were completely fraudulent, no trading occurred and the posted returns were fake.

100.   The Defendants' omissions were material because they deprived Scheme Customers of valuable information that the customers would have considered when deciding to participate in trading forex and/ or digital asset commodities.

101.   During the Relevant Period, as alleged in paragraphs 1-79 above, Defendants, directly and/or indirectly, violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3).  At all such times,

Zhu did not act in good faith or knowingly induced, directly or indirectly, Justby to commit the acts and/or omissions alleged as violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3), as set forth herein.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Zhu is liable as controlling person for Justby's violations Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3).

102.   During the Relevant Period, as alleged in paragraphs 1-79 above, Zhu acted within the course and scope of his respective employment, agency, or office with Justby.  Pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), Justby is liable as a principal for Zhu's violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3).

103.   Defendants engaged in the acts and practices described above willfully, intentionally, or recklessly.

104.   Defendants engaged in the acts and practices described above using instrumentalities of interstate commerce, including but not limited to:  interstate wires for transfer of funds, email, websites, and other electronic communication devices.

105.   Each act of misappropriation, fraudulently providing false records, and failing to disclose material information to Scheme Customers, including but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3).

## VII.   RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by 7 U.S.C. § 13a-1, and pursuant to the Court's inherent equitable powers, enter:

A.      An order finding Defendants Zhu and Justby liable for violating Sections 4b(a)(2)(A)-(C) and 6(c)(1) of the Act, 7 U.S.C. §§ 6b(a)(2)(A)-(C),  9(1), and Regulations 5.2(b)(1)-(3) and 180.1(a)(1)-(3), 17 C.F.R. §§ 5.2(b)(1)-(3), 180.1(a)(1)-(3) (2022);

B.      An order of permanent injunction permanently restraining, enjoining, and prohibiting Defendants Zhu and Justby, and any other person or entity associated with them, from engaging in conduct described above, in violation of Sections 4b(a)(2)(A)-(C) and 6(c)(1) of the Act, 7 U.S.C. §§ 6b(a)(2)(A)-(C), 9(1), and Regulations 5.2(b)(1)-(3) and 180.1(a)(1)-(3), 17 C.F.R. §§ 5.2(b)(1)-(3), 180.1(a)(1)-(3);

C.      An order of permanent injunction prohibiting Defendants Zhu and Justby and any other person or entity associated with them from directly or indirectly:

(i)      Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § la(40));

(ii)      Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2022)) or "digital asset commodities" (as described herein), including Bitcoin and Ether, for their

- 30 -

own personal account(s) or for any account(s) in which any Defendant has a direct or indirect interest;

(iii)    Having any commodity interests or digital asset commodities, including Bitcoin and Ether, traded on any Defendant's behalf;

(iv)    Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests or digital asset commodities, including Bitcoin and Ether;

(v)    Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests or digital asset commodities, including Bitcoin and Ether;

(vi)    Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9)(2022); and

(vii)    Acting as a principal (as that term is defined in 17 C.F.R. § 3.1(a) (2022)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the Commission, except as provided for in 17 C.F.R. § 4.14(a)(9);

D.      An order directing Defendants Zhu and Justby, as well as any successors thereof, holding companies, and alter egos, to disgorge, pursuant to such procedure as the Court may order, all benefits received from the acts or practices which constitute violations of the Act and Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

E.      An order directing Defendants Zhu and Justby, as well as any successors thereof, to make full restitution to every person who has sustained losses proximately caused by the violations of the Act and Regulations described herein, and pre- and post-judgment interest thereon from the date of such violations;

F.      An order directing Defendants Zhu and Justby, as well as any successors thereof, to provide a full accounting of all Scheme Customer funds they have received during the Relevant Period as a result of the acts and practices that constituted violations of the Act and Regulations, as described herein;

G.      An order directing Defendants Zhu and Justby to pay a civil monetary penalty, to be assessed by the Court, in an amount not to exceed the penalty prescribed by 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, 129 Stat. 584 (2015), title VII, Section 701, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2022), for each violation of the Act and Regulations described herein;

H.      An order requiring Defendants Zhu and Justby to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2); and

I.      Such other and further relief as the Court deems proper.

Dated: June 22, 2023                    Respectfully submitted,

                                        U.S. COMMODITY FUTURES
                                        TRADING COMMISSION

                                        /s/ James H. Holl, III
                                        JAMES H. HOLL, III. CA Bar. No. 177885
                                        KAREN KENMOTSU, *Pro Hac Vice* pending
                                        TRACI RODRIGUEZ, *Pro Hac Vice* pending
                                        PAUL G. HAYECK, *Pro Hac Vice* pending
                                        Attorneys for Plaintiff
                                        COMMODITY FUTURES
                                        TRADING COMMISSION
                                        1155 21st Street, N.W.
                                        Washington, D.C. 20581
                                        Telephone: (202) 418-5000
                                        jholl@cftc.gov
                                        kkenmotsu@cftc.gov
                                        trodriguez@cftc.gov
                                        phayeck@cftc.gov

COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY
PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS